# 22-252 (L)

# 22-346 (XAP)

IN THE

**UNITED STATES COURT OF APPEALS**

FOR THE

**SECOND CIRCUIT**

Wilfred Robert Curtis, Esq.

Plaintiff-Appellant-Cross-Appellee,

v.

Teresa Greenberg, Esq., The Law Office of Yeung & Wang, PLLC, William J. Larkin, III, Esq., Larkin, Ingrassia & Tepermayster, LLP, Todd A. Kelson, Esq., Todd A. Kelson, PC, Mishael Minnie Pine, Esq., Ronald A. Berutti, Esq., Weiner Law Group, LLP, Gregory Sheindlin, Esq., Sheindlin Law Office, Niloufer Bassa,

Defendants – Appellees,

Jeffrey Saltiel, Esq., Wenig, Saltiel, LLP,

Defendants-Appellees-Cross-Appellants.

_____

**ON APPEAL FROM THE UNITED STATES DISTRIC COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

**BRIEF FOR PLAINTIFF-APPELLANT-CROSS-APPELLEE**

**Wilfred Robert Curtis, Esq.
1190 Bedford Avenue, 4B, Brooklyn, New York 11216
Phone: (347) 240-4897 / Email: robert.curtis1943@gmail.com**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………………………………ii

JURIDICTIONAL STATEMENT………………………………………………………ii

CONCISE STATEMENT OF THE CASE…………..…………………………..…..1

STATEMENT OF ISSUES PRESENTED FOR REVIEW………..………..……..2

SUMMARY OF ARGUMENT………………………..…………………………4

     **Enterprise I.**

     **Enterprise II**

STANDARD OF REVIEW………..…………………………………….…4

ARGUMENT……………………………………………..………………..…4

CONCLUSION WITH RELIEF SOUGHT…………...…..……..…………….…7

CERTIFICATE OF COMPLIANCE…………………..……………….…8

SUMARY OF THREE ISSUES.....................................................8

DISCUSSION OF THREE ISSUES .................................................10

CONCLUSION.............................................................37

CERTIFICATE OF COMPLIANCE (FORM 6)…………...……………….....41

# TABLE OF AUTHORITIES

Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007)…………………..…………………………4

*Bell Atl, Corp. v. Twombly,* 550 U.S. 544, 570 (2007)……………………………..4

*Forest Part Pictures v. Universal Television, Inc.*,

     683 F.3d 424, 429 (2d Circuit 2012)……………..…………………………..…….4


Statutes

18 U.S.C §§ 1962(c) and (d)………...…………………ii, 2, 3, 18, 20, 33, 36, 37, 38

Article 81 of the New York

     Mental Hygiene Law...…………………………….. 1, 3, 20, 25, 27, 33, 36

# JURIDICTIONAL STATEMENT

Jurisdiction of this matter by the United States Court of Appeals for the Second Circuit is established because this appeal is taken from the Memorandum & Order of United District Court Judge Pamela K. Chen dated September 23, 2021, and because the defendants have allegedly violated 18 U.S.C §§ 1962 (c) and (d), a federal statute ("RICO").

## CONCISE STATEMENT OF THE CASE

Plaintiff-Appellant, W. Robert Curtis ("Curtis") filed his Second Amended Complaint (SAC) in the Eastern District of New York on July 27, 2020 after being asked by Magistrate Judge Lois Bloom to reduce the number of pages and exhibits contained in the Complaint. At the same time Plaintiff asked the Lower Court to order Defendants to provide a copy of his case files maintained by the attorneys, assigned to him during a guardianship proceeding in state court, immediately, so he could draft a factually accurate and complete complaint about the events occurring when, for two years, he was not permitted to make decisions about his person or assets and the six attorneys made substituted decisions on his behalf (during his medical care for 30 days of detoxification and his rehabilitation for more than 20 months). Record, Tab 1. Because that application was denied by the Lower Court, Curtis was required to draft the SAC without the six files legally belonging to him.

The SAC states that Defendants[1] formed an enterprise that stole millions of dollars from Curtis when acting under the authority of Article 81 of the New York

---

[1] Defendants, with the exception of Niloufer Bassa ("Ms. Bassa"), are all attorneys who billed Plaintiff's estate through their law firms. Each (with the exception of Defendant Sheindlin) represented Curtis over a period of two years (collectively "Defendant Attorneys") and together directly stole money (through completely unnecessary legal fees) and caused damages through their fraudulent schemes that exceeded $6,000,000. These wrongs occurred while Curtis was the subject of the Article 81 Proceeding where the Defendant Attorneys exercised total control of Curtis' assets of approximately $10,000,000 and absolutely controlled of all the decisions Plaintiff wanted to make about life.

Mental Hygiene Law. R. Record, Tab 2. The SAC shows how these wrongs violated both 18 U.S.C §§ 1962 (c) and (d). Nevertheless, the Honorable Pamela K. Chen, District Court Judge in the Eastern District of New York dismissed all RICO claims with prejudice on September 23, 2021. Record, Tab 3. Curtis thereafter filed a Motion for Reconsideration on October 21, 2021. That motion was denied by the Honorable Pamela K. Chen on January 19, 2022. Docket, 138. A Notice of Appeal was timely filed by Curtis. On February 9, 2022, Curtis filed a motion to proceed *in forma pauperis* in the District Court. Docket, 142. That application was denied by Judge Pamela K. Chen by Order dated February 9, 2022. Docket, unnumbered last entry. Because Curtis' lack of liquid assets, Curtis also filed a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Second Circuit. Record, Tab 4. That application was denied by this Court on July 13, 2022. Record, Tab 5.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether the District Court erred when reading the SAC where Plaintiff specifically identified the units making up both Enterprises I and II and the Court did not?

---

2

Did the lower Court err by being unable to understand the profound damages caused to Plaintiff during two years of medical care and recovery when Defendants did not permit Plaintiff to make any decisions about himself or his assets, because as the Court characterized it, when Plaintiff attempted to make decisions and communicate them to his attorneys, these decisions "interfered" with their work.

Did the lower Court err by not ordering the Attorney Defendants to provide Plaintiff with the documents in their files that legally belonged to Plaintiff when he requested them (especially in light of the fact that most documents were withheld during the two years the Defendant Attorneys represented him in the Article 81 Proceeding), or in the alternative require Plaintiff to bond the legal fees the Attorney Defendants claimed to be owed to them, so that Plaintiff could obtain this documentary evidence to write a factually accurate and complete complaint?

Did the lower court err by not perceiving that the SAC alleged separate 18 U.S.C §§ 1962 (c) and 18 U.S.C §§ 1962 (d) violations by defendants?

Whether mail and wire fraud by professionals, including attorneys representing the subject of a state guardianship proceeding, may constitute violations of 18 U.S.C §§ 1962 (c) and (d) if these professionals use their trusted roles to affectively steal millions of dollars through the substituted decision-making afforded by the state court?

## SUMMARY OF ARGUMENT

The SAC successfully alleges all required elements of the RICO claims, even in light of the Defendant Attorneys withholding copies of their communications with others, including each other (basis for mail fraud) and their banking activity (basis for wire fraud) from Plaintiff.

## STANDARD OF REVIEW

The Court must accept the facts alleged in the SAC as true for the purpose of deciding Defendants' motions to dismiss. *Forest Part Pictures v. Universal Television, Inc.*, 683 F.3d 424, 429 (2d Circuit 2012). "A complaint must contain <u>sufficient</u> (emphasis added) factual material, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

## ARGUMENT

Curtis now asks this Court to review the basis for dismissal of the SAC by the Eastern District Court and either reinstate it directly, or direct the Defendant Attorneys to produce a copy of their complete files immediately and allow Curtis to file a Third Amended Complaint.

Respectfully, all of the required elements of the RICO claims have been adequately

pleaded in the SAC, including the two enterprises, Enterprise I and Enterprise II.

**Enterprise I.**

Enterprise I comprises of Defendant Law Office of Yeung & Wang,

P.L.L.C. – which employs Defendant Teresa Lin Greenberg, Esq, -- and of the

related corporations of 1031 Vest L.L.C., Title Track Agency, and First American

Title Insurance Company ("FATIC") which it controlled or owned before, during,

and after Defendant Teresa Lin Greenberg, Esq. became the attorney for Curtis.

Tab 2, ¶¶ 11, 18, and 19.

The fraudulent schemes begin with Defendants promise to become the

financial planner for Curtis, focusing on the profound effect of the 1031 Exchange

on each year's tax returns.  While making that important promise, Defendants

never met or communicated with Curtis, as the stated, and actually withheld the

document necessary for Curtis to plan his life himself.

The fraudulent schemes also include intentionally giving the wrong value of

the Brooklyn property to Curtis.

The third fraudulent scheme occurred when Greenberg provided a windfall

to the seller of the Brooklyn property, an individual who was a friend.

The fourth scheme was based on telling Curtis that all documents in Greenberg's file were previously provided to him when they were not.

Based on the financial analysis of Peter Bullis, Plaintiff's accountant, it may be inferred about the economic exchanges that ........(paragraphs 7.7, 3.5, and .5).

**Enterprise II**

The fraudulent schemes employed by Defendants to enrich Enterprise II from Curtis' assets include the following.

Converting a temporary consent-guardianship (two months while under medical care to detoxify from the alcohol addiction) to a permanent guardianship that lasted for two years.

Defendants' false statement to the Courts about the continuing incapacity of Curtis and thus the need for extensive litigation on his behalf. (paragraph 7c)

Placing Curtis at The Landing at Poughkeepsie to die when he had chosen another place to successfully recover. (paragraph 7a)

The liquidation of Landmark Farm, Curtis' home and office, against the wishes and instruction of Plaintiff. (paragraph 7b)

Defendants' concealment of litigation activities from Curtis.

## CONCLUSION WITH RELIEF SOUGHT

Reinstate Second Amended Complaint and allow Plaintiff to proceed with its prosecution and to recover the assets essentially stolen by the Defendant Attorneys through unnecessary and excessive billing and obtain compensation for the damages caused to Curtis by their other wrongs.

When the Defendant Attorneys took control of Curtis by eliminating his decision making and substituting their own, his estate was worth approximately $10,000,000. Today, given the tax liens caused by the Greenberg Defendants, his Brooklyn may be worthless. Curtis has a hundred thousand dollars in liquid assets but not enough income to support his monthly expenses, including his addiction to the nicotine in cigars. Plaintiff should be able to get these assets back and enjoy life during the last decade(s) of it.

Plaintiff respectfully asks this Court to follow the law and allow that to happen.

In the alternative, Curtis requests this Court to order the Attorney Defendants to immediately provide Plaintiff with the documents in their files that legally belong to Curtis and require Defendants Kelson who is owed $14,880.50 under a fee claim on appeal and Berutti who is owed $89,321.43 on a fee claim now on appeal so that Plaintiff may finally be able to draft a factually accurate and complete complaint.

Upon receiving copies of his case files, Plaintiff should be given leave to file a Third Amended Complain based on the events that actually occurred during the two years Defendant Attorneys took complete control of Curtis' person and assets.

## CERTIFICATE OF COMPLIANCE

The brief and record are filed electronically in this Court's General Docket so all defendants except Defendant Bassa have been served. Plaintiff mailed by UPS the brief and record to Defendant Bassa on September 17, 2022 to her home address located at Apartment 2B, 1190 Bedford Avenue, Brooklyn, New York 11216 (in the Brooklyn Property).

Plaintiff moves under Fed. R. 59(e) to ask this Court to reconsider three parts of its Memorandum and Order dismissing the Second Amended Complaint ("SAC") dated September 23, 2021, which was entered as a final judgement on September 24, 2021, and dismissing all state claims without prejudice ("Decision").[2]

## SUMMARY OF THREE ISSUES

First, this Court made a fatal ruling on May 7, 2020 when it determined that the attorney-Defendants would be permitted to continue to conceal Plaintiff's files, the contents of which contain the legal papers and communications that legally

---

2. Plaintiff has commenced a new action based on the state claims dismissed without prejudice against these Defendants in the New York Supreme Court, Orange County, Index No. EF005754/2022.

belonged to him.  This ruling prevented Plaintiff from drafting a competent

complaint because Plaintiff was required to state the facts supporting the required

elements without the benefit of those files.  Instead, Plaintiff was required to rely

on flawed short-term memory only, a memory that was impaired by a partial

incapacity in 2015 and 2016, and still flawed thereafter during incremental

rehabilitation in 2017 and 2018.  The wrongs identified and articulated in the

complaint, therefore, necessarily suffered from the prison of an incomplete

chronology of facts (and the very existence of other facts) that occurred when

substituted decisions were made and memorialized in paper (legal papers and

communications).  The Court's May 7, 2020 ruling allows Defendants to continue

to conceal these facts by allowing them to withhold the files they created even

though these papers legally belong to Plaintiff.  Without a complete picture which

would have been easily drawn from all of the attorney's files, Plaintiff did not have

a complete set of facts about what was being done with his life when he was not

legally there.  Thus, while the Court demanded that Plaintiff have sight, it kept him

blind.  And while the Court expected a perfectly concise complaint containing all

the knowledge and connections that lay hidden in the attorney files, during the

several conferences had with the Court, it failed to order that those files be turned

over so that a Complaint would have been possible.  The bottom line is that access

to Plaintiff's own files is axiomatic and should not have been construed as him being given discovery prematurely.

Second, the Decision completely misstates the identity of, and interconnections among, the entities of Enterprise 2 as they are clearly and explicitly set forth in the allegations of the SAC.

Third, the Court misperceives the interactions between Guardian Pine and Plaintiff. By doing so, the Court mischaracterized Plaintiff's "interferences" with Defendant Pine's decision-making as the essence of the Complaint instead of the complete disempowerment of Plaintiff by Defendants when each rejected all of Plaintiff's decisions, ignored his instructions (as the Court acknowledges, with Kelson actually threatening to quit as his attorney handling his legal affairs including personally managing the various litigations), and kept him uninformed of that part of his life they controlled. The Court's conception places the arrow of influence in the wrong direction and reduces the number of wrongdoers from five to one.

## DISCUSSION OF THREE ISSUES

**First Error (the Court allowed Plaintiff's legal papers and communications to continue to be concealed from him by Defendants).**

By letter dated Mach 31, 2020, Plaintiff specifically asked the Court to require the attorney-Defendants to immediately meet their legal obligation to provide Plaintiff with the documents and communications from his file, as he had repeatedly requested of them many times before, so that he could prepare an accurate, concise, and complete complaint as required by Fed. R. 7(a)(1).  Dkt. 19. Plaintiff did not seek discovery of Defendants (interrogatories, depositions, admissions, etc.), but rather the delivery of legal papers and communications in the possession of Defendants **that belonged to him**, before amending the complaint. Plaintiff merely asked the Court to enforce his existing legal rights that were being destroyed by Defendants.

During a phone conference with the Court on May 7, 2020, Plaintiff again stated that obtaining possession of the papers he was legally entitled to was necessary to draft a proper amended complaint.  The Court denied that application, describing it as premature discovery.  Dkt. 26, p. 26.

At that time, the Court was made aware by Plaintiff that the attorney-Defendants had repeatedly withheld and/or culled their attorney files despite repeated requests made to them that Plaintiff receive a copy of his file.  Dkt. 1, Ex. 25, Dkt. ¶¶ 83(A) and (B),288(D), 298, 299, 300, 324, 325, 329, and 355.

Respectfully, the Court erred when conceptualizing Plaintiff's application as a request for "premature" discovery. Plaintiff's application instead was made to level the playing field, to be sure the facts exclusively held by defendants could be brought to bear on the question of what happened to the millions of dollars that disappeared from Plaintiff's estate during a period of two years. [3]

---

[3] The Court may recall that two of the Defendants took the position that Plaintiff was still mentally impaired and thus not competent to pursue this federal action at all. The Court denied that application to dismiss the complaint on May 7, 2020. Dkt. 26, p.23. The Court, while noting the serious inadequacies to the complaint, nevertheless refused to require Defendants to produce a copy of the file that belonged to Plaintiff because it constituted "premature discovery." However, the initial Complaint provided facts which the Court seems to have ignored when deciding to keep Plaintiff separated from the legal documents and communications that governed his life for two years while he was partially impaired. The Complaint shows Plaintiff was incapacitated during 2016 and 2017. Dkt. 1, p. 2, ¶¶ 2, 12, Ex. 4 at pp. 8, 9, Ex. 11. During 2017 and 2018 Plaintiff was involved in full time medical care that incrementally led to the recovery of his ability to exercise both short-term and long-term memory. Dkt. 1 ¶ 17, 315. Then the guardianship was finally terminated by the Surrogate Count on January 11, 2019 with full decision-making returned to Plaintiff (and thus control over legal fillings and communications with professionals). Dkt. 1, ¶ 400. The initial Complaint explicitly identifies the Treatment Plan written during Plaintiff's rehabilitation that led to his complete recovery. Dkt. 1, Ex. 24, 26, and 27. Clearly the Court knew before the May 7, 2020 ruling that Plaintiff was working every day during this period to improve his brain functions while at the same time trying to resolve his "failed" relationship with Pine (who possessed all of the documents produced by her and those created by the other professionals) who also concealed facts about Plaintiff's life while they were occurring apart from him. Dkt. 1, Ex. 24, No. 11, Ex. 26, p. 1 ("I still experience a fair amount of anxiety … caused by the lack of information about and control of my assets which are being spent at a rate of approximately $150,000 a month ….. [c]ontemporaneous information about these activities have been withheld from me"), Dkt. 1, Ex. 26, p. 2. The Court knew that Defendant Berutti "refused to talk with Plaintiff and refused to provide any documents." Dkt. 1, Exhibit 27, No. 12. Clearly the Court also knew on May 7, 2020 that Plaintiff, even while partially impaired, had negotiated specific agreements with his attorneys that he would contemporaneously receive all legal papers and communications related to their work while he was under the guardianship. Dkt. 1, ¶¶ 58, 83 A and B, 138 (D). Therefore, this Court knew that Defendants were legally obligated (since the Surrogate would approve and order the payment of legal fees, a retaining lien could not be asserted in this matter) and medically obligated to provide these legal papers and communications to their client. Additionally, this Court knew that Plaintiff was required to draft the complaint under conditions

The law governing this situation of attorney misconduct is very clear. When requested by a client, an attorney is required by law to produce a copy of the file he maintained.

Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn, L.L.P., 666 N.Y.S.2d 985 (Ct. of Appeals 1997), explains it best: "A majority of courts and State legal ethics advisory bodies considering a client's access to the attorney's file in a represented matter, upon termination of the attorney-client relationship, where no claim for unpaid legal fees is outstanding, presumptively accord the client full access to the entire attorney's file on a represented matter with narrow exceptions…."

"Affording the client presumptive access to the attorney's entire file on the represented matter, subject to narrow exceptions, is also supported, although not

---

where all of his personal and professional papers were destroyed by a fire on January 19, 2017. Dkt. 52, pp. 250 – 256. The Court also knew of the facts that constituted his lengthy imprisonment (no rights or assets and no way to communicate with the outside world) by Defendants at The Landing at Poughkeepsie. Dkt. 52, pp. 276 – 279. Thus, on May 7, 2020, this Court knew that there was a special significance to Plaintiff being able to exercise his legal right to receive the papers the attorney-Defendants maintained in their files. Plaintiff was required to draft some allegations of facts that occurred when he was incapacitated and thus were not in his memory. Plaintiff was also required to draft some allegations of fact that occurred during his lengthy rehabilitation and thus only partially available from his mid-term memory. Clearly Plaintiff's memory alone (of the alleged fraud) was an inadequate source for drafting the pleadings of the SAC. Plaintiff's memory, together with the papers about his life that were concealed would have provided an adequate basis for Plaintiff to draft a proper complaint. The Court's refusal to grant Plaintiff's application thus requiring him to draft the allegations from a flawed source, one that could have simply and easily been corrected by the Court by enforcing Plaintiff's legal rights. That was error.

13

necessarily dictated, by the lawyer's ethical obligations arising out of representation in a given matter. As we recognized in *Tekni–Plex, Inc. v. Meyner & Landis*, 89 N.Y.2d, at 130, 651 N.Y.S.2d 954, 674 N.E.2d 663, an attorney's fiduciary relationship with a client may continue even after representation has concluded. Among the duties of an attorney as a fiduciary and agent of the client are those of openness and conscientious disclosure. As we remarked in another context, equally applicable here, "[s]ince the reign of Elizabeth I, the law has as a matter of policy encouraged full disclosure between attorney and client" (*Matter of Jacqueline F. v. [Segal],* 47 N.Y.2d 215, 218, 417 N.Y.S.2d 884, 391 N.E.2d 967). That obligation of forthrightness of an attorney toward a client is not furthered by the attorney's ability to cull from the client's file documents generated through fully compensated representation, which the attorney unilaterally decides the client has no right to see (*see,* Restatement [Third] of Law Governing Lawyers, *op. cit.,* § 58, comment c [citing full disclosure obligations of a fiduciary to a beneficiary and of an agent to a principal in Restatement (Second) of Trusts § 173, at 378; Restatement (Second) of Agency § 381, at 182].

The New York Rules of Professional Conduct also set forth that an attorney should "promptly pay or deliver to the client or third person as requested by the client or third person the funds, securities, or other properties in the possession of

14

the lawyer that the client or third person is entitled to receive."  22 NYCRR 1200, Section 4.

Subsequent New York Courts have applied this logic, to discipline attorneys, and at times even temporarily suspend them from the practice of law, who fail to turn over their files to their clients.  See, e.g. *In the Matter of Edward M. Cohen*, 801 N.Y.S.2d 333, Appellate Division, 2nd Dep't 2005 (finding attorney violated the Code of Professional Responsibility for his failure to return client files despite numerous requests);  *In re Cohen*, 801 N.Y.S.2d 333 (2005) (suspending an attorney from the practice of law for not turning over his files after repeated requests by the client); *In Re Edelman*, 924 N.Y.S.2d 55, Appellate Div., 1st Dep't (2011) (suspending lawyer from practice of law for sixth month period for, among other things, failing to return documents to client;" *In Re McQuade*, 976 N.Y.S.2d 414, 976 N.Y.S.2d 414, Appellate Division, 3rd Dep't (2013) (noting that a failure to turn over his files to a fiduciary and the fiduciary's counsel" resulted in a suspension from the practice of law for a period of 18 months).

Even if money is owed and a retaining lien is exercised, there are exigent circumstances when a client's file should nevertheless still be turned over to a client.  See, e.g., *Moraitis v. Moraitis*, 694 N.Y.S.2d 588 (1999).  *In Moraitis*, *supra*, the Court underscored that it has the "inherent power to compel an attorney to restore assets, monies, or papers of the client received or retained in violation of

15

the attorney's professional obligations").  In this case, the Court noted that the "refusal of counsel to turn over the client's file will cause prejudice to the opposing party, who is the plaintiff in the matrimonial action, and also to the children, who are placed in the middle of a bitter custody dispute that will continue to their detriment).

These cases show a clear rule that applies to this case.  Plaintiff was/is legally entitled to a complete copy of his case files in the possession of Defendants.  When Plaintiff repeatedly requested them, Defendants either ignored Plaintiff or culled their files for partial production of legal papers and communications.  Moreover, there were exigent circumstances to receive these legal papers and communications.  First and foremost, Defendants were acting in the stead of Plaintiff for two years and that he had a right to know what happened during this time;  and also, he needed to draft a proper complaint to obtain redress for these wrongs.

Instead, the Court allowed this action to go forward knowing the attorney-Defendants, while seeking to extinguish Plaintiff's claims, were continuing to breach their fiduciary duty, but now with permission of the Court.

In addition to the Attorney-Defendants' ongoing breaches of their fiduciary duties, the Court also knew that the guardianship was a consent-guardianship.  Dkt. 1, Exhibit 20.  Thus, this Court knew that the Surrogate Court knew from the

beginning that Plaintiff **had the initial capacity to agree to a pla**n that appointed professionals to temporarily manage his assets and person during the period of his recovery.

Clearly the Surrogate Court knew, as this Court should have known, that as recovery occurred, the decision-making authority of Plaintiff would increase incrementally until it made sense to terminate the guardianship altogether.

Thus, this Court erred in not understanding that Plaintiff was partially competent at the beginning of the guardianship, and step by step became more competent to demand the delivery of his legal papers to protect to rights.[4]  Plaintiff did exercise this authority to demand his files, during and after the guardianship. This Court failed to perceive the conditions of the guardianship, where the attorney-Defendants had the very high obligation to meet their fiduciary duties of a consent guardianship.  Especially here where rehabilitation was ongoing and proving successful.  The Court did not consider that the attorney-Defendants'

---

[4]  Strikingly, nowhere does the Court acknowledge the important medical facts that occurred between 2016 and 2018.  Plaintiff's brain healed incrementally over that period of time, an event that involved intense daily exercises and no future use of alcohol.  The Court's summary statement that "[t]he 103-page, two-volume SAC essentially allege that Defendants took advantage of Plaintiff's alcohol abuse" seems not just pejorative, but surely inaccurate. Decision, p. 2.  Plaintiff stopped drinking and Defendants' wrongs were more than 'taking advantage of Plaintiff,' rather they consisted of stealing millions from Plaintiff by substituting their own decisions to follow a path of personal enrichment explicitly rejected by Plaintiff. Putting the concealed files together will establish that fact.  Why else would five professionals, trained in the law, want to conceal the thousands of paper documents Plaintiff paid them to write.

intentional breaches during a <u>consent</u> guardianship destroyed Plaintiff's ability to formulate a competent complaint. It was therefore error to require Plaintiff to draft his complaint about the wrongs that caused seven million dollars to be taken from his estate in two years, without the aid of his attorney's files.

**Second Error (the Court Misperceived the elements of "Alleged Enterprise 2," "Racketeering Activity," and "Continuity").**

The Court has misperceived the construction of Enterprise 2 as it is actually set forth in the SAC, and thus consequently, mistakenly applied the alleged facts to the additional elements required to plead 18 U.S.C. §§ 1962(c) and (d) violations.

The Decision, states that Enterprise 2 "allegedly is composed of the Larkin Defendants, Defendant Pine, the Kelson Defendants, the Berutti Defendants, the Sheindlin Defendants, the Saltiel Defendants, and Defendant Bassa." Dkt. 122, p. 8.

The Decision likewise states, "Plaintiff claims the Alleged Enterprise 2 comprises of the Larkin defendants, the Kelson Defendants, Pine, the Berutti Defendants, the Sheindlin Defendants, and Bassa." Dkt. 122, p. 27.

Finally, when summarizing the elements of each cause of action at the end of the SAC, the Court states that "Larkin, Ingrassia & Tepermayster, LLP, Todd A. Kelson, P.C., the Weiner Law Group L.L.P., The Sheindlin Law Firm, and Wenig

Saltiel, L.L.P. are each units of Enterprise 2." It also states "Pine may also be a unit of the Enterprise 2." Dkt. 122, ¶ 516.

The SAC alleges a completely different construction of Enterprise 2.

The SAC alleges that "Larkin, Ingrassia & Tepermayster, LLP is the first unit of a second enterprise." Dkt. 52, ¶ 36. The SAC alleges that "Todd A. Kelson, P.C. is the second unit of [ ] Enterprise 2." Dkt. 52, ¶ 85. The SAC alleges that "Pine was [only] employed by and associated with Enterprise 2." Dkt. 52, ¶, 104. Here Pine is identified "perhaps as its third unit" awaiting the production of her file.

Throughout the SAC Pine's role is defined as a "participant" of Enterprise 2 and "associated" with this corporate enterprise. That contingent participation by Pine simply acknowledged that not having access to the papers and communications that are in her possession that belonged to Plaintiff prevented him from properly alleging her actual role beyond being employed by and associated with the all-corporate enterprise.[5] In addition, not having the complete Pine files, also made it difficult to allege her role as paymaster for Enterprise 2.

---

[5] It is assumed that Pine, as guardian, had the complete papers maintained by all other attorneys. It is also assumed that she retained her communications with Bassa when she allegedly encouraged Bassa to write to the Surrogate Court stating that Plaintiff was 'drinking alcohol every day and that his life and The Brooklyn Property were spiraling out of control,' in order to achieve her reappointment.

The SAC specifically alleges that "the Weiner Law Group L.L.P. became the fourth unit of the Enterprise 2 in violation of 18 U.S.C. §§ 1962(c) and (d)." Dkt. 52, ¶ 138. The SAC alleges that (t)he Sheindlin Law Firm became the fifth unit of Enterprise 2 in violation of 18 U.S.C. §§ 1962(c) and (d)." Dkt. 52, ¶ 150. The SAC alleges that Wenig Saltiel, L.L.P. "became the sixth unit of Enterprise 2 in violation of 18 U.S.C. §§ 1962(c) and (d)." Dkt. 52, 157. Nowhere in the SAC is it alleged that Bassa became a unit of Enterprise 2.

Thus, these 5 corporate-Defendants (all law firms), were explicitly alleged in the SAC to have formed the unlawful Enterprise 2, not the 12 individual and corporate units mistakenly identified by the Court in its Decision.[6] Thus, when the Court subsequently analyzed the other elements connected to "Alleged Enterprise 2," its logic became faulty and distorted.

---

[6] The Court stated '[u]ltimately, Plaintiff relies on the communications between his Article 81 representatives and he various other Defendants in an attempt to link them all in an association." Dkt. 122, p. 31. Respectively, the Court imposed an "association-in-fact" concept on the SAC sweeping up all individual and corporate Defendants into a single organization it labeled 'Alleged Enterprise 2' so as to dismiss "a RICO claim because Plaintiff failed 'to allege fraudulent or illegal conduct separate and distinct from the alleged predicate racketeering act itself – a requirement in [the Second] Circuit.'" Dkt. 122, p. 33. In fairness to the Court, Plaintiff obviously failed to run a "spell-check" on the last edition to meet an almost-missed deadline thus uploading the SAC with numerous typos to which the court took note. Plaintiff, as well, failed to use more precise wording when summarizing the prior 500 paragraphs in paragraph 520 of the SAC. It clearly should have read "Enterprise 2, through the employees and individuals associated with it, employed certain schemes that damaged Plaintiff's business and property, including:"

The Court states that "Plaintiff fails to establish that the individual Defendants in Alleged Enterprise 2 "functioned as a unit" … existing separate and apart from the pattern of activity in which it [allegedly] engaged[d]," which is a dispositive deficiency under the Court's leading cases of *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc*., 385 F.3d 159 (2d Cir. 2004) and *D'Addario v. D'Addario, 901 F.3d 80*, respectively. The Court erred when applying the RICO requirements since it misunderstood the enterprise to contain a mix of 12 units, rather than the five law firms that wrongfully received and distributed Plaintiff's assets through a corrupted guardian as is pleaded.

The fraud committed by the Attorney-Defendants (individual defendants), who executed the schemes set out in the SAC at paragraph 520 A-K, is comprised of attorney-activities, separate and apart from Enterprise 2's wrongful receipt and distribution of Plaintiff's assets. As the court noted in its Decision at pages 9 and 10, and as fully discussed in the SAC, these activities include the following:[7]

---

[7] At its beginning, the SAC summarizes the unique individual fraudulent schemes into "five overarching schemes" which had they been completed by Defendants, Plaintiff, who is 77, would be dead or living alone in a supervised facility without assets or rights." Dkt. 52, ¶ 7. These five overarching schemes, designed by Plaintiff to state the purpose of Enterprise 2, include (A) Plaintiff's imprisonment at The Landing at Poughkeepsie, (B) Defendants' liquidation of Landmark Farm, (C) Defendants' cynical manipulation of medical information, (D) Defendants' plan to liquidate The Brooklyn Property which was stopped when Plaintiff confronted Defendants with their fraud, and (F) Defendants' withholding and culling the files that belonged to Plaintiff.

1. [p]lanning the death of [Plaintiff] (Larkin,[8] Kelson,[9] Pine),

2. controlling [Plaintiff's] assets for Defendants' own economic benefit rather than the interest of Plaintiff (Larkin, Kelson, Pine, Berutti,[10] Saltiel),

3. manipulating Plaintiff with threats of quitting (Kelson),

4. obtaining the authority of the Court through deception (Larkin, Kelson, Berutti),

5. secretly converting a temporary guardianship into a permanent guardianship (Larkin, Kelson, Pine),

6. obtaining an unnecessary Receiver against the instruction of Plaintiff (Berutti, Kelson, Pine),

7. obtaining an unnecessary property manager against the instruction of Plaintiff (Kelson, Berutti, Pine),

8. making frequent substituted decisions against the wishes and instruction of Plaintiff (Larkin, Kelson, Pine, Berutti, Saltiel)

---

[8] The elements of schemes initiated by Larkin are set forth in paragraph 82 of the SAC.

[9] The elements of the schemes initiated by Kelson are set forth in paragraph 101 of the SAC.

[10] The elements of the schemes initiated by Berutti are set forth in paragraph 141 of the SAC.

22

9. liquidating Landmark Farm against the wishes and instruction of Plaintiff (Kelson, Pine),

10. planning the liquidation of the Brooklyn Property against the wishes and instruction of Plaintiff (Kelson, Pine, Saltiel),

11. planning and imposing on Plaintiff the liquidation of an escrow account against the wishes and instruction of Plaintiff to pay their legal fees (Kelson, Berutti, Sheindlin),

12. setting priorities as attorneys not in the interest of Plaintiff and concealing their own priorities including foregoing valuable legal claims held by Plaintiff (Larkin, Kelson, Pine, Berutti),

13. interfering with Plaintiff's Treatment Plan with the intent to delay his recovery (Kelson, Pine, Berutti),

14. withholding contemporaneous legal and financial papers to impair Plaintiff's decision-making (Larkin, Kelson, Pine, Berutti, Saltiel),

15. imprisoning Plaintiff at The Landing at Poughkeepsie seeking certain death rather than rehabilitation (Larkin, Kelson, Pine), and

16. presenting false invoices and false reports to the Court in concert with each other (Kelson, Pine, Berutti, Saltiel).

The SAC also alleges that Larkin engaged in an elaborate fraudulent scheme to obtain Plaintiff's assets for his estranged daughter, who is also simultaneously a client of Larkin.  Dkt. 52, ¶¶ 38 – 63.

The SAC also alleges that neither, Larkin, Kelson, nor Pine corrected the substantial errors made by Mary Breheney, an independent Court Evaluator, because they wanted her mistakes to be believed by the Court.  Dkt. 52, ¶ 68.

The SAC also alleges that Kelson and Pine engaged in a scheme to continue their respective Court appointments long after Plaintiff recovered.  Dkt. ¶¶ 99 and 100.

Clearly the SAC cannot be dismissed based on there being no pleaded distinction between Enterprise 2 and the fraudulent activities of the attorney-defendants set forth above.  They are pleaded to be different things.  Enterprise 2 is made up of the law firms that acted as a collective vehicle to improperly receive money (legal fees and expenses) from Plaintiff's assets, distribute these assets, provide the administrative support for the attorneys engaged in the fraudulent schemes (e.g., telephonic calls among the entities and with the court, typing and filing papers that were also served on each entity, doing financial analysis and accounting that was served on each entity, conducting legal research shared among Defendants, as well as other paralegal activities).

Regarding the issue of the Racketeering Activity, with the Court's analysis of Enterprise 2 so fatally flawed, the Court's application of the important requirement becomes equally flawed.

The Court states Plaintiff "ultimately alleges a single fraudulent act to deceive the state court[11] into appointing a guardian so Alleged Enterprise 2 could take his property and assets. Once the court found that Plaintiff was incapacitated and appointed Pine (the result of the alleged fraud), the Alleged Enterprise began to reap the benefits of its purported misconduct (taking Plaintiff's assets without his interference"[12]). Dkt. 122, p. 33.

As the Court noted, the Racketeering Activity alleged in the SAC involved mail fraud and wire fraud (the transfers of the monies involved banks). As the Court notes, "Rule 9(b) permits knowledge to be averred generally, but plaintiffs … still must plead the factual basis which gives rise to a strong inference of fraudulent intent," citing *United States v. Strock*, 982 F. 3d 51, 66 (2d Circuit). "The requisite strong inference of fraud may be established either (a) by alleging

---

[11] The SAC sets out the identity of four, not one, state cases in which racketeering activity took place. Dkt. 52, p.3. The first was the Article 81 Proceeding. The second was the matter before Justice Rosa, which was completely compromised when Larkin commenced the Article 81 Proceeding on behalf of Plaintiff's estranged daughter when he was the attorney for Plaintiff. In the second complaint, among other things, the SAC alleges that Berutti suborned the perjury of Pine, obtained the appointment of Receiver Saltiel against the instruction of Plaintiff, and wrongfully sought the liquidation of The Brooklyn Property.

[12] This new concept of "interference" imposed on the SAC is discussed in the following section.

facts showing that the defendants had both motive and opportunity or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Strock</u>, 982 F.3d at 66. Plaintiff did both.

As identified above, the individual fraudulent schemes set forth in the SAC are listed by each attorney-Defendant individually.

As to the 'motive and opportunity," as well as "strong circumstantial evidence of conscious misbehavior or recklessness by the Attorney-Defendants, the overview of alleged conscious misbehavior and recklessness of the attorney-Defendants begins in paragraph 7 of the SAC with the circumstances described in extraordinary detail for the next 500 paragraphs.

The SAC sets forth numerous examples of the strong circumstantial evidence that thousands of emails sent by Defendants, including interstate emails to and from the Berutti firm in New Jersey, were required to execute the alleged fraudulent schemes, and the hundreds of wire transfers were required to remove $7,000,000 from Plaintiff's Estate by Defendants. Dkt. 52, ¶¶ 109, 131, and 521.

Regarding the element of Continuity or Pattern, the court seems to have mistakenly concluded that the SAC presents "open-ended" continuity, and with this determination, it applied the legal requirements of that concept.

In fact, the SAC presents a closed-ended continuity where the "pattern" requirement is met by showing a threat of continuous criminal activity and whose continuous activities are related to each other. Specifically, Kelson's practice is based on Article 81 Proceedings and he is on the list of attorneys to be appointed by Surrogate Courts in the future seeking qualified attorneys. Dkt. 52, ¶¶ 88 – 92. Likewise, Pine's law practice is listed in the Office of Court Administration's approved Part 34 list of guardians to be appointed by future Surrogate Courts. Likewise, Saltiel is listed as a qualified Receiver, awaiting appointments by the New York Courts.

As set forth in the SAC and Plaintiff's Memorandum of Law in Opposition to All Defendants' Motions to Dismiss, Berutti and his New Jersey law firm advertise in New York as specialists in corporate, estate and matrimonial (a "Matrimonial Shark") actions as aggressive litigators seeking work in New York state. Dkt. 52, ¶¶ 139 and 140 and Dkt. 85, Ex.t 21.

Significantly, that the criminal activity occurred over two years, not two months, is fully alleged in the SAC.

Clearly, the SAC does not "artificially fragment [ ] a singular act into multiple acts," as the Court states (which is a consideration for closed-ended continuity), because the occurrence of multiple fraudulent schemes executed by

multiple Attorney-Defendants in four separate court proceedings over a two-year period is the essence of this pleadings.

Clearly the threat of the continuity of Enterprise 2 is that Kelson has placed himself and his firm on a New York statewide list asking Surrogate Courts to appoint him as the attorney for future Wards. Pine is there as well seeking the same work from appointing courts. Likewise, Saltiel with his firm is on the list for approved Receivers.

The existence of these lists creates the threat that corporate-Enterprise 2, or spin-offs of it, will once again seek the services of Berutti and his firm (who lists a track record of successful multimillion dollars cases including one involving "taking the deposition of President Donald Trump") to engage in unlawful racketeering when assigned and trusted to handle new guardianships that join the some 100,000 guardianships already in existence.

Defendant Bassa is a unique actor within the SAC because she and Defendant Sheindlin, who is an attorney, are the only *pro* se defendants. It is noteworthy that the Court spent a considerable amount of the May 7, 2020 phone conference[13] instructing Bassa how to use the Court's *pro se* office and to obtain

---

[13]  In this conference as well as the two previous ones, Magistrate Judge Lois Bloom urged Plaintiff to simplify the complaint by dropping Bassa from it and indicated if Plaintiff did not, he would be treated as not acting in good faith and reasonably. Dkt. 36, pp. 4, 5, 9, 16;  Dkt. 46, pp. 12; and  Dkt.. 122, pp. 9, 10, 13, 21, 30, 32, and 33.

special training as pro se defendant (all of which illustrates the enormous exercise of responsibility by the Court to assist a *pro se* party) so she could effectively defend herself in this matter.[14] While such special assistance is admirable, what is not is that the Court omitted numerous pleaded allegations in the Judgment to dismiss the claims against her,[15] and as a result, Bassa must be treated separately in this Motion for Reconsideration.

Respectfully, the Court has entirely misconceived the alleged role of Defendant Bassa. As shown above, Bassa is not a member of the Alleged Enterprise 2 as the Court explicitly stated. Bassa participated in two fraudulent schemes:

1. Assisting Pine, Kelson, and Berutti when liquidating The Brooklyn Property against the wishes and intent of Plaintiff by emailing false facts to the Surrogate Court, and

2. Assisting in the reappointment of Pine as Guardian by providing to the Surrogate Court false information about Plaintiff's mental health and the wasting

---

[14] Magistrate Judge Lois Bloom send materials directly to Bassa to assist her in the defense of this action as well as identified free training which would assist her. Dkt. 122 pp. 17, 18, and 19.

[15] See Dkt. 122, p. 30 and 31.

of assets through the mismanagement of The Brooklyn Property as is clearly alleged in the SAC.

Besides participating in these two existing schemes, Bassa created two of her own fraudulent schemes: (1) destroying the operations of The Brooklyn Property (a) harassing tenants and AirBnB guests and (b) making numerous false reports to public authorities about conditions at The Brooklyn Property, and (2) attempting to infect Plaintiff with a dangerous disease when he was in the target age-group and had an underlying disability.

Respectfully, the Court omitted many facts alleged in the SAC about Bassa that should have been accepted as true for the purpose of deciding her motion to dismiss. The mere nine lines[16] of facts devoted to Bassa's alleged illegal activities should have included the following allegations contained in the SAC, many of them disclosing her intent to harm Plaintiff financially and physically:

1. Bassa currently resides at The Brooklyn Property where she is considered by law to be a squatter because she has not paid rent for almost three years. SAC, Dkt. 52, ¶¶ 166.

2. Bassa resides at The Brooklyn Property without the consent of Plaintiff, SAC, Dkt. 52, ¶ 182.

---

[16] See Dkt 122, p.6.

3.  Bassa causes ongoing damages to Plaintiff in the amount of $5,000 a month because she occupies a furnished apartment otherwise used for AirBnB guests.  SAC, Dkt. 52, ¶¶166.

4.  Bassa was employed by Plaintiff at $65,000 annually before she was terminated for cause.  SAC, Dkt. ¶¶ 172,

5.  Bassa has repeatedly written to everyone in Plaintiff's social network, including emails to opposing counsel and the Surrogate Court itself, stating that Plaintiff is dangerous to others and to himself.  SAC, Dkt. 52 ¶¶ 175, 187 and 195(E).

6.  Bassa has falsely repeated, orally and in writing, that Plaintiff has abused her.  SAC, Dkt. ¶ 187.

7.  In other litigation, Bassa has written and stated deceitful statements to the Court.  SAC, Dkt. ¶¶ 190, 195.

8.  Bassa has forged Plaintiff's name to his checks and attempted to negotiate them.  SAC, Dkt. ¶ 194.

9.  Bassa supported the application by Berutti and Kelson for a guardianship to be reimposed on Plaintiff by making utterly false statements to the Court such as

that Plaintiff was drinking again,[17] that Plaintiff cannot make decisions, that

Plaintiff was lying to the Court, that Plaintiff needs therapy, and that Plaintiff is a

danger to himself and to others.  SAC, Dkt.  ¶¶ 195.

10.  Bassa knowingly tried to create a basis for an enraged daughter to

challenge Plaintiff's new Will due to his incapacity when making it.

11.  Bassa sabotaged repairs to The Brooklyn Property after being

terminated.  SAC, Dkt. ¶ 198.

12.  Bassa repeatedly called 311 to make false reports alleging the existence

of illegal apartments in The Brooklyn Property.  SAC, Dkt. ¶ 199.

13.  Bassa repeatedly called the police to report that Plaintiff was harassing

her and stealing her mail.  SAC, Dkt.  ¶ 200.

14.  Bassa contacted Plaintiff's accountant by phone to falsely communicate

Plaintiff's new "so-called" incapacity and his "so-called" harassment of her.  SAC,

Dkt. ¶ 2015.

Thus, rather than participating in only one scheme, as the court found, Bassa

participated in two of them, and created two of her own to assist the corporate-

Enterprise and their Defendant-attorneys wrongfully obtain control of Plaintiff and

---

[17]  The SAC alleges that this threat was so serious and false (Plaintiff's own agents working together to once again strip him of all rights and take absolute control of his remaining assets), Plaintiff voluntarily entered a Sober Link program to establish that Plaintiff was not using alcohol as Bassa told the Surrogate Court.  Dkt. 1, Exhibit 11.

his assets. Her obvious goal was to be reemployed as the property managers and receive free rent for as long as possible.

**Third Error (the Court did not Understand the Mechanisms of, and Damages, caused by Defendants' Substituted-Decision-making)**

The final flaw discussed by the Motion for Reconsideration involves the Court's imposition on Plaintiff's conduct the concept of "interference" with Pine's decision-making by him, rather than Plaintiff's inability to make decisions himself because of the disempowerment caused by Defendants.

While this third error is more complex, the court is respectively asked to consider it as the most harmful of the three analysis undertaken by the Court and is pervasive throughout the decision. In summary, the Court converted the psychological concept of "substituted decision-making," where individual attorney-Defendants made all life decisions about Plaintiff's assets by controlling his person, into a concept of "interference" experienced by the guardian when Plaintiff's expressed his dissatisfactions.

This misunderstanding sets aside the most important concept that the court should have been armed with when determining <u>when</u> wrongful acts by professionals, during a routine Article 81 Proceeding, become violations of 18 U.S.C. Sections 1962(c) and (d).

33

Here, the psychological intent behind the substituted decisions of each Defendant should have been the basis of an analysis of their contemporaneous motivations to control Plaintiff's person and take his assets. That understanding is fundamental to understanding the fullness of Defendants' wrongs. The Court's analysis shows it was not equipped with this understanding.

That converted concept ("substituted decision-making" into "interference") is cemented into the Decision in the Court's summary of the case. The Court stated that the SAC "asserts that Defendants misled New York Courts about Plaintiff's need for a court-appointed guardian and then, when a guardian was appointed, sought to manage Plaintiff's assets against his interest without "interference." Dkt, 122, p. 2. Later this new concept of "interference" is used as a way to rule that Plaintiff only "ultimately alleges a single fraudulent act to deceive the state court into appointing a guardian so Alleged Enterprise 2 could take property and asses." Dkt. 122, p. 33.

The Court erred in not giving full weight to the true condition of Plaintiff during the multi-month course of his recovery; requiring limited substituted decision-making during the initial steps of medical care and requiring that control of his life be given back to him as he recovered. The Court improperly analyzed the allegations from the perspective of the guardian, the decision maker for

Plaintiff rather than the Plaintiff himself whose wishes were supposed to be aligned with the guardian as she stood in his stead.

The Court's error amounts to an analysis placing the arrow of influence going in the reverse direction as in Pine ← Plaintiff.  The alleged facts show the arrow goes in the other direction (and involves other defendants).  Hence the facts should not be spun to say the Plaintiff did not like that he could not "interfere" with Pine's decisions.  Rather, it was a violation of the guardian's fiduciary duty, as well as the other defendants, to continue to take total control of Plaintiff's decision-making when incapacitated, when recovering, and when recovered, as if Plaintiff had no brain or person at all for two years.

Larkin represented the adverse interest of Plaintiff's estranged daughter while totally controlling Plaintiff's knowledge, as an attorney-agent not adequately handling and eventually abandoning his legal cases.  Larkin and Pine → Plaintiff.[18]

---

[18]  The SAC could not have been clearer about the role of Pine as the conduit for the other Defendants wrongs braided together with her own.  There was no relationship between Pine and Plaintiff because there was no human interaction.  Pine never had a conversation with Plaintiff.  She never called.  There were few meetings and at them, when Pine said she would do something Plaintiff requested she never did.  What litigation papers were provided, they were delivered incomplete and in bulk, too late for Plaintiff to have any input into the litigation decisions and/or financial decisions being made.  When asked to be part of her phone conversations with other defendants, she refused.  When asked to be copied on her emails, she refused.  When asked to send copies of all of her emails to Plaintiff's son Kent, she refused.  When asked to receive copies of emails sent to and received from Plaintiff's daughter, she refused.  When asked to send a copy of each check when it was cut, she refused.  When asked to request Plaintiff's permission by phone before cutting any check for more than $5,000, she refused.  When asked to provide copies of invoices with checks she cut, she refused.  When asked not to make certain large

Kelson took total control of Plaintiff's decision-making to advance his own financial interests.  Kelson and Pine → Plaintiff.

Berutti took total control of Plaintiff's decision-making and refused to listen to Plaintiff's instruction about how to handle his legal cases (e.g. not to appoint a Receiver) and to obtain a half million dollars in fees including splitting the escrow fund with Sheindlin (if he were completely successful).  Berutti and Pine → Plaintiff.

Against the direction of the Court's rulings, obtained by Plaintiff when appearing *pro se,* Saltiel took total control of Plaintiff's decision-making by preventing Plaintiff's access to, management of The Brooklyn Property so that it could be eventually liquidated as sought by Kelson, Berutti and Pine.  Saltiel and Kelson and Berutti and Pine → Plaintiff.

Respectfully, this is the single most important concept that the court should have been armed with when determining <u>when</u> the misconduct by professions during the regular course of an Article 81 Proceeding become violations of 18 U.S.C. Sections 1962(c) and (d).

---

unauthorized payments, Pine ignored Plaintiff.  When asked to get periodic written reports from the Receiver, she refused.  Pine formally objected to Plaintiff moving into The Brooklyn Property.  And Pine would not provide information about the various litigations that were occurring. Dkt 52, Ex. 26.  Despite all of Pine's wrongs, Kelson refused to petition to have her discharged when requested by Plaintiff, or simply discharge her for cause.

The psychological intent of each Defendant is what should drive an analysis of their contemporaneous motivations and thus the power to exercise substituted decisions to control Plaintiff and take his assets, and is fundamental to understanding the fullness of Defendants' fraudulent schemes. The Court's analysis shows it was not equipped with this understanding.

Thus, the Court erred by not giving full weight to the true condition of Plaintiff during the multi-month course of his recovery let alone Defendants' substituted decision-making during the initial steps of medical care, and during rehabilitation, when whatever control taken should have been given back to Plaintiff as part of his recovery. The Court mistakenly analyzed the allegations in the SAC from only the perspective of the guardian.

This error/distinction is all the more critical because this Court did not recognize that Plaintiff objected to these substituted decisions contemporaneously with them being made.

## Conclusion

The Court has rejected Plaintiff's position that it must consider the important public policy question raised by the SAC, which is: <u>when</u> does the misconduct of attorneys, here including intentionally deceiving a Surrogate Court, constitute a violation of 18 U.S.C. §§ 1962 (c) and (d)? Plaintiff has adequately pleaded that

the law firms employed by Plaintiff had become a criminal enterprise and that the

fraudulent schemes by multiple attorney-defendants had caused damages to

Plaintiff of some $7,000,000.

The issue of "when" misconduct by attorneys occur in a routine

guardianship constitutes a violation of 18 U.S.C. §§ 1962 (c) and (d)[19] has

important state and national consequences. According to CNN's recent special

named "Britney v. Spears," there are some 1.5 guardianships nationally. Thus, if

the United States population currently is 330 million people and the New York

State population is 20 million, then there may be as many as 100,000 guardianships

in New York State.

As the SAC demonstrates, even with Plaintiff being trained as an attorney,

recovering from his incapacity, and being willing to publicly confront Defendants

with their fraud, he barely escaped from the loss of his life. While Plaintiff is

grateful for surviving the whole episode, Justice is not being served here, and the

defendants are free to do this again with other guardianships.

---

[19] Because the substantive claims have been successfully alleged in the SAC, the agreements
among Defendants as set forth therein, support the validity of Plaintiff's § 1962(d) claims.

Clearly, this Court should re-evaluate the essence of the SAC without these errors so that future attorneys bent on enriching themselves with their Ward's assets will understand the potential consequences of being defined as racketeers.


/s/   W. Robert Curtis

W. ROBERT CURTIS, *Pro Se.*
NYS Attorney Registration Number 2137115
1190 Bedford Avenue, 4B
Brooklyn, New York 11216
Phone: (374) 240-4897
Email: robert.curtis1943@gmail.com


TO:

Teresa P. Greenberg, Esq.
38-08 Union Street, Suite 11E
Flushing, NY 11354

The Law Office of Yeung & Wang, P.L.L.C.
38-08 Union Street, Suite 11E
Flushing, NY 11354

William J. Larkin, III, Esq.
626 East Main Street
Middletown, New York 12250

Larkin, Ingrassia & Tepermayster, L.L.P.
626 East Main Street
Middletown, New York 12250

Todd A. Kelson, Esq.
542 Union Ave
New Windsor, NY 12553

Todd A. Kelson, P.C.,
542 Union Ave
New Windsor, NY 12553

Mishael M. Pine, Esq.
75 S Broadway Ste 4-4022
White Plains 10601-4413

Ronald A. Berutti, Esq.
629 Parsippany Road
Parsippany, New Jersey 07054-3701

Weiner Law Group, L.L.P.
629 Parsippany Road
Parsippany, New Jersey 07054-3701

Jeffrey Saltiel, Esq.
26 Court Street, Suite 1200
Brooklyn, New York 11242-1112

Wenig, Saltiel L.L.P.
26 Court Street, Suite 1200
Brooklyn, New York 11242-1112

Gregory Sheindlin, Esq.
200 Vesey Street, 24th Floor
New York 10281

Sheindlin Law Office
200 Vesey Street, 24th Floor
New York 10281

Niloufer Bassa, pro se.
1190 Bedford Avenue, 2B
Brooklyn, New York 11216

**Federal Rules of Appellate Procedure Form 6. Certificate of Compliance With Type-Volume Limit**

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This document complies with [the type-volume limit of Fed. R. App. P. [*insert Rule citation; e.g., 32(a)(7)(B)*]] [the word limit of Fed. R. App. P. [*insert Rulecitation; e.g., 5(c)(1)*]] because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) [and [*insert applicable Rule citation, if any*]]:

   ☑ this document contains 9,110 words, **or**

   ☐ this brief uses a monospaced typeface and contains [*state the number of*] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑ this document has been prepared in a proportionally spaced typeface using 2010 Microsoft Word in 14 Times New Roman, **or**

   ☐ this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

(s) W. Robert Curtis

Attorney for W. Robert Curtis

Dated: 11/9/2022